# Exhibit 11:

**Order Approving Settlement in *Doe v. Roman Catholic Diocese of Covington* filed January 31, 2006**



COMMONWEALTH OF KENTUCKY
BOONE CIRCUIT COURT
CASE NO. 03-CI- 00181

JOHN DOE et al.                                                    PLAINTIFFS

VS.

ROMAN CATHOLIC DIOCESE
OF COVINGTON, et al.                         ·                     DEFENDANTS

## ORDER APPROVING SETTLEMENT

INTRODUCTION

On October 21, 2003, the Court (Judge Bamberger sitting) certified this case as a

class action under Kentucky Civil Rule 23. Subsection 5 of that rule provides:

> A class action shall not be dismissed or compromised
> without the approval of the court, and notice of the
> proposed dismissal or compromise shall be given to all
> members of the class as the court directs.

On May 17, 2005, the parties reached a tentative settlement of all claims. The

settlement was later supplemented by a memorandum dated July 18, 2005. Subsequently,

on July 20, 2005, the Court reviewed the proposed settlement and ordered that the class

be given notice of its terms. A hearing date was set to determine whether the settlement

should be approved and to allow any affected parties to voice objections. Although

several objections were filed, all have since been withdrawn. The case is now before the

Court for its approval of the settlement.





As all parties before the Court now support approval of the settlement, the case is currently not an adversarial proceeding. Nonetheless, the Court should not simply "rubber-stamp" the settlement, but rather has a duty to make an independent judgment regarding whether the settlement is "fair, reasonable and adequate."[1] In doing so, the Court is not free to fashion what it believes is a "better" settlement. It must either approve or not approve the proposed settlement. Because Civil Rule 23 is virtually identical to, and modeled on, Federal Rule of Civil Procedure 23, the Court may look to federal precedents for guidance.

Many factors may be considered in deciding whether to approve a settlement. In no particular order some are:

- Likelihood of recovery at trial

- Amount of discovery completed and stage of proceeding when settlement reached

- Ability of defendants to withstand greater liability

- Reasonableness and amount of settlement fund

- Whether similar segments of the class are treated differently

- Whether different segments of the class are treated similarly

- Future expense and likely duration of litigation

- Number of objections and nature of objections

- Reaction of class to the settlement

- Whether settlement was reached after arms length negotiations

- Experience of class counsel

- Other benefits of settlement

---

[1] 4 *Newberg on Class Actions* (4 ed. 2002) Secs. 11.43-54

2

BACKGROUND

In the present action, ten individual Plaintiffs (using pseudonyms), on behalf of themselves and others similarly situated, sued the Diocese of Covington (the "Diocese") for damages they sustained when, as minors, they were sexually abused by various priests, teachers, and other employees of the Diocese. Though no individual abuser has been named as a defendant, the Plaintiffs allege the Diocese is liable because it was negligent in the hiring, supervision and retention of its abusive employees. In addition to monetary damages, the Plaintiffs seek injunctive relief, including the public disclosure of records relating to past abuse.

Among other defenses, the Diocese has asserted the statute of limitations. The statute of limitations applicable to actions based on child abuse provides that a plaintiff must bring an action within a period of five years commencing when the child reaches majority. KRS 413.249.[2] Conversely, the Plaintiffs seek to avoid the five-year bar through the application of another statute that tolls the five-year period for any time during which the defendant "by absconding or concealing himself or by any other means obstructs the prosecution" of an action. KRS 413.190(2).[3] The Plaintiffs allege that the

---

[2] This statute was enacted in 1998 and was retroactive. 1998 Ky. Acts, Ch 577, Sec 2.

[3] Although this court has not been called upon to rule on the issue directly, there has been argument elsewhere that the five-year statute of limitations applies only to the actual abuser or is not subject to the tolling statute relied upon by the plaintiffs. There is nothing in the language of the statute that suggests it is limited to claims against the actual abuser. As to the application of the tolling provision, both the statute of limitations and the tolling statute are found in Chapter 413 of the Kentucky Revised Statutes. The five-year limitations statute is contained in subsection 249, and the tolling statute is found in subsection 190. However, the tolling statute by its own terms applies only to statutes of limitations found in subsections 90 to 160. Therefore, in reading the two statutes literally, one could conclude that the tolling provision does not apply to the five-year limitation statute. The tolling statute predated the enactment of the five-year limitation statute, and the bill creating the five-year period merely created a "new section of KRS Chapter 413." It did not specify a subsection. Thus, the Reviser of Statutes assigned a subsection number to the limitations statute. KRS 7.140. By deciding where to place the statute (whether within or outside the 90-160 bracket), the reviser ostensibly determined whether the new 5-year limitations period was subject to the existing tolling statute. Several other tolling provisions limit their application to subsections 90 to 160. It is highly unlikely that the Legislature in retroactively extending the limitations period and adding a discovery provision to provide "justice to the victims of sexual abuse" intended to deprive the mentally impaired of the general protections afforded to all litigants by the general tolling statutes. KRS 413.170.

3

Diocese obstructed the prosecution of the cases against it, and hence, tolled the statute of limitations by failing to report known sex offenders as it was obligated to do by law. KRS 620.030; *Roman Catholic Archdiocese v. Secter,* 966 S.W.2d 286 (Ky. App. 1998).

The parties have engaged in discovery and several trial dates have been set but continued by agreement. They have also tried to settle the case through the use of a mediator.

As noted above, this matter has been certified as a class action. Since its initial certification the Class has been expanded so that it is now composed of:

> All persons who, while still minors at any time prior to October 21, 2003, were subjected to acts of sexual abuse and sexual misconduct by priests or other persons who at the time of such abuse or misconduct were assigned to or employed by the Diocese of Covington or any of its parishes or institutions.

Prior to its certification the Diocese objected to the case being certified as a class action, however, it has not made a motion to decertify the class and has subsequently joined with the Plaintiffs in moving to expand the class.

At the same time that the Court ordered publication of the notice of a proposed settlement, it also took a census of the class. The class members have been required to identify themselves in order to participate in the settlement. The census is complete. While it is not possible to determine exactly how valid many claims there will ultimately be, it is unlikely to exceed 350.

---

The Legislative Research Commission probably gave the five-year statute an inappropriate subsection number.

4

## THE SETTLEMENT

The total settlement is memorialized in four separate documents. Two reflect the agreement between the Class and the Diocese, and two reflect a settlement between the Diocese and its insurance carriers.

### The Amount of the Settlement

The primary settlement document between the Class and the Diocese is a memorandum of understanding dated May 15, 2005. Under the terms of that memorandum, the Diocese agrees to contribute $40 million in cash or property to a settlement fund. In exchange for the contribution to the fund, the class agrees to drop its case against the Diocese and release it from any liability. The parties agreed, however, to pursue the Diocese's claims against its insurance carriers for additional funds. The Court never fully understood why the parties handled the potential insurance recovery as they did. However, the soundness of the mechanics used and the wisdom of the approach taken is no longer relevant as the Diocese has, with the Plaintiffs' approval, settled all claims against its insurance carriers.

The settlement with the Diocese's insurance carriers is embodied in two agreements, one with The American Insurance Company ("American Insurance") and the other with Catholic Mutual. American Insurance issued one policy that covered the period June 1966 through June 1967 and contained a limit of $100,000 per claimant with no limit on aggregate liability. American Insurance has agreed to provide coverage of up to $100,000 per claim and to be bound by the procedures used in this action to determine damages. American Insurance's obligation will be prorated in the event a claimant's abuse spanned more than its one year of coverage. Currently, it is estimated that as many

5

as forty-eight class members might be covered, at least in part, by the American Insurance policy.

Catholic Mutual provided coverage for the years 1968 through 2005. It has never denied coverage and has provided the Diocese with a defense. It has agreed to contribute $40 million to the settlement fund, of which $15 million will be paid immediately. The remaining $25 million will be paid over a period of five years using general obligation interest bearing notes. Payment of the notes would accelerate as Catholic Mutual obtains payments from its reinsures. While Catholic Mutual retains the right to protest the individual awards to class members, it has agreed to be bound by the result of the administrative process to be established in this case.

*The Distribution of the Settlement Fund*

Under the provisions of the agreements the settlement fund will be handled, in broad terms, as follows:

a. Five percent of the settlement fund will be set aside to pay counseling fees for any victim of sexual abuse, including non-class members.

b. Five percent will be set aside to pay claims of any putative class members who were born after October 21, 1980 and who do not currently participate in the settlement.

c. Eighteen percent will be set aside in an Extraordinary Injury Fund.

d. The remaining seventy-two percent will be distributed to the class using a four-tiered schedule. Under this formula, a class member will be placed in one of four categories based solely upon the nature of the abuse endured by the class member without regard to the damage the abuse ultimately produced. Each category has its own range of permissible compensation. The more severe the abuse, the higher the category and the greater the range of the potential compensation. For example, a child who was

6

abused by a priest fondling him "over the clothing" would fall into Category Two and have a potential recovery range of $15,000-$150,000. A child who experienced the same abuse but "inside his or her clothing" would be placed in Category Three with a higher potential range of recovery.

e. In addition to compensation based upon the nature of the abuse, the agreement allows for possible additional compensation to those class members who fall in the two highest categories. This additional compensation will be keyed to the injury sustained as a result of the abuse. The Extraordinary Injury Fund would be the source of these awards. For example, one child could have been abused and suffered certain effects as a result of the abuse. A second child, however, though suffering identical abuse, may have experienced more damage than the first child due to a lack of counseling, his family situation, his own character, or any other reason. As a result, the second child will be eligible to receive additional compensation from the Extraordinary Injury Fund.

f. If the total amount payable under the schedule exceeds the amount available, all claims will be reduced on a pro rata basis ("ratcheted down").

g. Any funds not needed for the settlement will be returned to the Diocese or Catholic Mutual as appropriate.

h. Under the settlement there will be no injunctive relief of any type.

i. The memorandum also provides for the establishment of a "reasonable procedure for the administration and verification of claims" and that an attorney's fee "to be determined by the Court" will be paid from the distributions to class members.

In summary, the Class will have approximately $80-85 million available to it, with some money available immediately and some available later, for distribution to its members. Claims will be paid using a guideline. The distribution to the class members will be made based primarily upon the nature of the abuse endured. If the total amount available is not sufficient to satisfy all claims as called for under the guidelines, all claims will be ratcheted down.

7

DISCUSSION:

As noted, this Court has an obligation to make an independent assessment of the settlement and give its approval if it finds the settlement to be fair, reasonable or adequate. In evaluating the settlement, the Court will look at the total amount to be disbursed as well as the manner in which funds are to be apportioned among class members.

*The Amount of the Settlement*

No evidence of the Diocese's financial condition has been introduced. In fact, some jurisdictions have found that a diocese owns the assets used by its individual parishes.[4] While a representative of Catholic Mutual testified that immediate payment of its full obligation would be financially disadvantageous or otherwise inconvenient, there was no evidence that it could not pay promptly or pay a larger amount. Therefore, the settlement cannot be approved based upon a finding that there was a limited fund available.

All settlements take place in the shadow of the law. In every tort case, each plaintiff must prove a wrongful act by the defendant which caused him or her harm. In this case, the Class asserts that the Diocese was negligent in the hiring, supervision and retention of the abusers. Each plaintiff also must overcome any defense raised by the defendant. In this case the Diocese has asserted the defense of limitations, and the Class seeks to toll application of the limitations statute on the grounds that the Diocese failed to report the abuse as required by law.

---

[4] *In re the Catholic Bishop of Spokane*, 329 B.R. 304 (Bankr. E.D. Wa. 2005); *In re roman Catholic Archbishop of Portland*,____ B.R._____ ,No.04-37154 (Dec. 30, 2005, Bankr D. Or).

Any evaluation of the settlement necessarily begins with the fact that a plaintiff asserting a claim identical to the typical class claim in this case has tried and won a jury verdict in a case against the Diocese, and the verdict was upheld on appeal. *Roman Catholic Diocese of Covington v. Secter*, 966 S.W.2d 286 (Ky. App. 1998). However, since *Secter*, which was tried in 1995, numerous other similar cases have come before Kentucky courts. At the trial level and the appellate level, most, if not all similar cases have been dismissed before trial because the statute of limitations has expired, or because the Diocese was not on notice that the abuser was a pedophile.[5] Therefore, regardless of the how these legal principles might ultimately play out in this case, the very existence of these unsuccessful cases indicate that the limitations defense is a formidable, albeit not insurmountable, hurdle for the class and would justify a very substantial reduction in the settlement value of its claims.

Over the past several years and continuing during the pendency of this action, the Diocese has settled individual claims similar to those asserted by class members. In so doing, it has paid out nearly $11 million to 58 claimants. Testimony at the hearing indicated that the schedule to determine payments under the settlement correlates with the amounts previously paid to the 58 individual claimants.

Because the date for completing the census of class members has passed, the Court has a reasonable estimate of the number of potential claimants. Using what preliminary information is available on the nature of the class members and the payment

---

[5] At the fairness hearing, the parties filed a list six Kentucky cases and eighteen foreign cases in which they assert that plaintiffs situated similarly to those here have had their cases dismissed based on the statute of limitations. While the court has not read all of the cases, as many are unpublished, it does not doubt the parties' characterization. In addition, other similar cases exist. See e.g., *Mcginnis v. Roman Catholic Diocese of Covington, Ky.*, No. 2002-CA-001610-MR, Kentucky Court of Appeals (Sept. 12, 2003); *Azerot v. Roman Catholic Bishop of Louisville*, No. 2004-CA-000666-MR, Kentucky Court of Appeals (Nov. 4 2005); *Francis v. Roman Catholic Bishop of Louisville*, No. 03-CI-004331, Jefferson Circuit Court, Kentucky (Nov. 26 2003). While none of the Kentucky cases are reported and hence not authority, their existence affects the value of this case.

9

schedule contained in the proposed settlement, it is possible for all claims to be paid according to the schedule. The Court finds this very persuasive as to the fairness of the settlement. However, even if payments made under the schedule are "ratcheted down," as the Court believes they will be,[6] the settlement would still be adequate.

The class action procedure has encouraged a large number of people to come forward who would otherwise never have done so had they been left to their individual devices. Also, the Court perceives that individuals who come forward early and on their own are less skittish of litigation than those who later join in. Also a defendant negotiating with an individual claimant considers factors different from those considered by a defendant negotiating with a class. Therefore, the Court finds that the settlement will not be unfair merely because each individual in the class may not receive as great a monetary settlement as that same individual might have received had he pursued an individual claim earlier or outside the class action.

It cannot be overlooked that the parties have taken extensive discovery and that experienced class counsel on both sides have bargained hard and at arms length.

Considering all of the above factors, the Court finds the total amount to be adequate.

---

[6] Some preliminary information is available on 231 potential claims. Using this preliminary information, extrapolating it to the class as a whole, and using the median value of each category, the Court calculates the payout under the four-tiered schedule would be $75 million. If this were to occur the amounts paid under the base schedule, excluding the Extraordinary Injury Fund and minor's fund, would need to be ratcheted down by twenty percent. This calculation is so rough and statistically unsound as to be practically meaningless. However, the Court performs this rough calculation to emphasize that its approval is not based on the assumption that class members will receive the full amounts called for by the schedule.

*The Method of Distribution*

The Court took the somewhat unusual step of requiring a census of class members prior to the approval of any settlement. At the hearing, there was testimony that perhaps less than one-half of the class members have come forward. Also, one *pro se* class member suggested that the class members needed additional time to gather the courage to come forward. This case has been pending for several years with substantial publicity in the local media. Class members were given notice and had over three months to submit their census forms. The Court does not believe extending that time period significantly would be practical or significantly increase class member participation.

As noted, the schedule used to determine compensation for the members of the class is based primarily on the nature of the abuse and, hence, does not take into account other strengths and weakness of each member's claim.

The Plaintiffs allege that the Diocese was negligent in hiring, retaining or supervising its priests. This means that to establish a claim, in addition to establishing that he or she was abused, each class member must show that the Diocese was both aware (or should have been aware) of his or her abuser's inclination to pedophilia and that it either failed to act or otherwise put the class member at risk. It is undisputed that many class members could meet this burden. Others, however, may find it impossible. For example, the first person abused by a particular priest might not be able to recover because the Diocese had yet no grounds to suspect that the priest was a pedophile. On the other hand, a person subsequently abused by the same priest might well be able to show negligence on the part of the Diocese in retaining the priest. As noted, the settlement does not attempt to distinguish between claims on this basis.

Similarly, there are differences between the class members' claims regarding the statute of limitations. Even though the Plaintiffs as a group might prove that the Diocese covered up its wrongdoing and, therefore, as a general matter that the statute of limitations should be tolled, the relative strength of individual claims might vary on this issue. For example, a class member who previously became suspicious of the Diocese's conduct and considered suing would find his or her claim barred.[7] Nevertheless, a class member in the same parish who was not as perceptive as the first member would not be barred from asserting a claim. The settlement does not attempt to distinguish between these claims.

In addition to the legal merits of the class claims, other factors come into play for the diocese in evaluating a settlement. On the Defendant's side, the Court believes that in addition to the Diocese's legal exposure, two additional factors motivated it to settle. In fact, the Court believes that these factors were ultimately more important considerations than the Diocese's legal exposure. One motivation is to avoid the publicity a trial would generate.[8] The second is the stated motivation of the Diocese to make a meaningful settlement for the past wrongdoing of its employees so that it can better minister to its communicants. Contrary to what might be the case in other dioceses, the Court believes that this professed desire is genuine and played a significant role in the Diocese's decisions. These two factors apply equally to class members with "weak" cases as well as to those with "strong" claims. Therefore, the Court finds that the legally unjustified egalitarian treatment of the class members was a factor in prompting the Diocese to contribute as it did. In addition, attempting to rate the claims based upon whether the

---

[7] *St. Clair v. Bardstown Transfer Line, Inc.*, 221 S.W.2d 679 (Ky. 1949).
[8] One of the conditions of the settlement is that the individual plaintiffs relinquish their claim for injunctive relief.

12

class member could establish liability or whether the claimant was particularly susceptible to the limitations defense would complicate the settlement procedure enormously and undo many of its benefits.[9]

The legal strength of a class member's claim rests upon the damages sustained and only indirectly on the abuse suffered. For example, a pianist who loses a thumb in an accident is treated very differently from a businessman who sustains an identical injury. As noted previously, with the exception of the Extraordinary Injury Fund, the settlement fund is distributed based upon the nature of the abuse and not the injury actually sustained. However, no other approach is really feasible. The abuse caused all claimants to suffer and prevented many from reaching their full potential as adults. Undoubtedly, many have been outwardly marred for life while others, for all intents and purposes, have led normal and successful lives. However, because each child experienced the abuse before he or she had a chance to develop or otherwise indicate the probable trajectory of his or her life, there is no way to predict what the future would have held for that child absent the abuse. Therefore, basing the recovery primarily on the nature of the abuse, with an exception for the extraordinary damage case, is the only feasible method.

As to the four categories used, they are graduated in a rational way. While one could certainly tinker with the number of categories used, refine the criteria for each, and adjust their relative value, from a common sense point of view and in a general way the categories reflect reality. It is unclear that further refinement would produce a markedly better result.

---

[9] The only other class action involving the settlement of "priest abuse" claims of which the Court is aware took a similar egalitarian approach. *In Re : Roman Catholic Bishop of Louisville, Inc.*, Jefferson County Circuit Court, Master File, Order (October 17, 2003) (*Turner v. Roman Catholic Bishop of Louisville, et al.* No 02-CI-02903)

13

Also, at the same time that the Court published notice of the settlement, it expanded the class. This expansion added thirty-five potential members to the class. While not determinative, the Court notes that none of the new members, each of whom had knowledge of both the settlement and the right to opt out, exercised that right.

Based on the above, the Court finds that the method of distribution is reasonable and fair.

FINDINGS:

The Court finds that the proposed settlement is fair, reasonable and adequate.

ORDER

For the above reason **IT IS HEREBY ORDERED:**

1. The settlement as evidenced in the memorandum between the parties and the settlement with the insurance carriers is approved.

2. Pursuant to Civil Rule 54.02 the order in the preceding paragraph is a final and appealable judgment, there being no just cause for delay.

3. The case is set for a pretrial on February 14, 2006 at 10:00am for a hearing on a motion for attorney's fees.

4. The case is set for further hearing immediately following the above hearing on February 14 to establish procedures for administering the settlement.

5. Five days prior to the hearing the Parties shall file a detailed memorandum outlining a proposed procedure for the administration of the settlement, motion for an attorney's fee and a detailed memorandum in support of the motion.

6. Class counsel shall serve notice of the above hearing on each class member by first class mail.

14

7.    The Court retains jurisdiction over the case as is necessary
to supervise and implement the settlement.

JOHN W. POTTER, SENIOR JUDGE
BOONE CIRCUIT COURT

Cc:    Robert Steinberg, Esq.
Stan Chesley, Esq.

Mark Guilfoyle, Esq.

Carrie Huff, Esq.

Michael O'Hara, Esq.

Ann Oldfather, Esq.

Judge John Potter

CERTIFICATE

I, PAT GUTZEIT, clerk of the Boone District Circuit
Court, thereby certify that I have mailed a copy of the
foregoing order and notice to all parties hereto at
their last known addresses or their counsel of record,
this ___ day of _____

PAT GUTZEIT
BOONE DISTRICT/CIRCUIT COURT
_____ D.C.

15